IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SCOTT MAHER,

                                                                           OPINION and ORDER

                   Plaintiff,

                                                                          18-cv-1061-bbc

      v.

DOUG BELLILE,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Pro se plaintiff Scott Maher is a patient civilly committed at the Sand Ridge Secure Treatment Center under Chapter 980 of the Wisconsin Statutes. He is proceeding on a claim that the center's broad policy restricting access to certain movies, books, music, magazines and photographs violates his First Amendment rights. Now before the court is defendant's motion for summary judgment. Dkt. #25. Because defendant has shown that there is a reasonable relationship between the center's restrictions and its legitimate interest in rehabilitating sex offenders, I will grant defendant's motion.

      Also before the court is plaintiff's motion to strike defendant's amended expert disclosures, dkt. #36, and plaintiff's motion for assistance in recruiting counsel, dkt. #43. As to the first motion, defendant sent plaintiff a timely expert witness disclosure on June 12, 2020, but defendant amended his expert disclosure on July 31 to add Jason Smith and Lindsey Wert as non-retained experts. Dkt. #31. Smith is the current treatment director at Sand Ridge and Wert is on Sand Ridge's video review team. Defendant's counsel says that

1

the omission of Smith and Wert from the list was an oversight—counsel did not realize that the former treatment director had been replaced by Smith and that Wert had become a member of the video review team. I will not strike defendant's amended disclosure because the disclosure does not prejudice plaintiff. Discovery was still open when defendant disclosed Smith and Wert to plaintiff, so plaintiff could have sought discovery about their opinions or qualifications had he wanted to. Moreover, defendant did not present evidence from Wert with his summary judgment materials, so the disclosure of Wert does not affect the outcome of the case. Smith's summary judgment declaration contains no surprises. Smith merely gives the opinion that certain media is counter-therapeutic for violent sex offenders. Plaintiff does not suggest that he is surprised or prejudiced by Smith's opinions.

I will also deny plaintiff's motion for assistance in recruiting counsel. As I explained when I denied plaintiff's first motion for counsel, the court recruits counsel only when it appears from the record that the factual and legal difficulty of the case exceeds the plaintiff's ability to litigate it. Dkt. #7 at 5 (citing Pruitt v. Mote, 503 F.3d 647, 653-54 (7th Cir. 2007)). In his pending motion, plaintiff provides no reason why he cannot litigate this case without counsel, beyond stating that "I really need a lawyers help." This vague statement is not enough to persuade me that plaintiff cannot litigate this case on his own. Plaintiff's filings in this case have been legible, coherent and have identified relevant facts and legal standards. Plaintiff responded to defendant's proposed findings of fact and submitted a declaration in opposition to defendant's summary judgment motion. Plaintiff's claim ultimately fails not because he did not have a lawyer, but because defendant has shown that

2

Sand Ridge's media policy is rationally related to a legitimate therapeutic purpose.

From defendants' proposed findings of fact, plaintiff's responses and evidence in the record, I find the following facts to be undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties and Background Information

Plaintiff Scott Maher is a civilly committed patient under Chapter 980 and a resident of Sand Ridge Secure Treatment Center. Sand Ridge is operated by Wisconsin Department of Health Services to provide specialized treatment services for persons who have been civilly committed under Wisconsin's sexually violent persons law, Chapter 980.  Sand Ridge provides specialized mental health treatment, rehabilitation, training and supervision to patients housed in the facility.  Defendant Doug Bellile is the director of Sand Ridge, and is responsible for approving all center policies that govern the day-to-day lives of patients at Sand Ridge.

Sand Ridge's treatment program uses evidence-based treatment methods to effect changes in the attitudes and behaviors of sexually violent persons, with the goal of returning patients to their communities with a reduced risk of sexual violence and recidivism.  Patients at Sand Ridge are placed in structured treatment tracks, depending on the patient's level of functioning.  Treatment is individualized, and treatment providers use cognitive behavioral techniques to support individual behavior change.

B.  Sand Ridge's Property Policies

To provide a secure and therapeutic environment, Sand Ridge places limits on what personal property patients may possess while at the center.  Sand Ridge Policy #115 is the personal property policy.  In developing the policy, Sand Ridge staff considered what personal property items patients would need to live a healthy, productive and rehabilitative lifestyle while at the center.  Property is not allowed if it would create security concerns or if it is deemed to be counter-therapeutic.  For example, patients are not allowed to possess personal computers and are not allowed general internet access based on staff's conclusion that computers and internet access would create security concerns and would be counter-therapeutic.

Policy #115 includes an appendix that provides a complete list of the personal property items that are allowed at Sand Ridge.  Patients may possess many types of electronic items, including radios, televisions, MP3 players, CD players, DVD and Blu-ray players and various video gaming devices.  Patients may possess up to 50 total cassette tapes, game cartridges, VHS tapes, CDs and DVDs.  Patients may have 25 publications in their possession consisting of books, magazines, newspapers, maps and other periodicals.  (The publication limit does not include legal, religious, educational or treatment-related publications.)  Any items not on the list are considered contraband, cannot be possessed by patients and will be removed if found in a patient's possession.  Patients may submit up to two requests per calendar year to add items to the appendix list of Policy #115.

All items received at Sand Ridge are screened, searched, x-rayed and approved before

being delivered to the patient. Mail staff reviews incoming reading material and pictures for content that might be considered contraband or counter-therapeutic. The treatment director helped create a checklist to aid in the review process. Counter-therapeutic items may include: full frontal nudity of adults; full or partial nudity of children; images that suggest child-like characteristics; sexually explicit material; and sexually violent material. (Sexually explicit material might be allowed it is has been authorized and is used for treatment purposes.) Items suspected of containing counter-therapeutic material are reviewed by the director, deputy director and occasionally the treatment director.

Sand Ridge also has policies and criteria relating to video, and has an approved video list and a banned video list. If a patient wants to add a video to the approved video list, the patient must submit a request to the video review team. The video review team has members from the therapy, treatment and security departments. The team uses a list of 12 criteria to decide whether a video should be approved or whether the video should be denied because it is counter-therapeutic for the Sand Ridge population. A video is deemed to be counter-therapeutic and will be denied if it:

    1. Depicts violence as a normal way of life; preferred, easy or only solution to problems.

    2. Sensationalizes and/or supports criminal or illegal activity or drug use.

    3. Depicts degrading sex or violent sex.

    4. Depicts gratuitous violence or senseless killing including graphic abduction, torture, violence and stalking.

    5. Includes full-frontal nudity.

6. Depicts non-consensual sex or sexual assault, including positive outcome rapes.

7. Depicts elements that feed offense-related sexual fantasies.

8. Depicts sex with minors.

9. Depicts children in a sexualized way or children portrayed as adults or older than they are.

10. Is primarily meant for an audience of children

11. Other.

According to Dr. Jason Smith, Psy. D., the treatment director at Sand Ridge, allowing patients unrestricted access to the internet, movies, CDs, DVDs, video games and video game equipment is not conducive to a therapeutic setting for sexually violent persons. Dkt. #29 (Smith Decl. ¶ 11). Smith states that the content of some media sends messages to the users about violence, fraud, sex, women and children that are not appropriate for patients at Sand Ridge. Id. Many civilly committed sex offenders have dynamic risk factors and responsivity problems, such as trauma, that can be aggravated by items in their environment. Id. ¶ 12. Movies, music and TV shows can be provocative and can trigger risk and trauma problems in patients, including sexual deviance and paraphilic behavior Smith says that videos that are prohibited for counter-therapeutic reasons pertaining to sexual deviance include those that depict nudity of children or adolescents, violent or degrading sex or abduction, torture or stalking, non-consensual sex and elements that feed offense-related sexual fantasies. According to Smith, many non-offending adults can view these materials without ill effects, but Sand Ridge patients have mismanaged their sexual behaviors such that

they might have a higher likelihood of being negatively influenced by the content of certain movies, music and TV shows.  Id.

The video review team relies on various websites and internet searches to gather summaries of a proposed video's content.  They frequently consult the website www.IMDb.com, which provides objective summarys and reviews of movies and TV shows.  They also consult www.commonsensemedia.org.

Ordinarily, if a patient requests that a video be reviewed, a member of the video review team is assigned to review the request.  If online summaries of the video are ambiguous, and if there is a question whether the video should be approved or denied for counter-therapeutic reasons, the entire team discusses the video at one of the teams' quarterly meetings.  At these meetings, a treatment department representative provides a clinical opinion on the video, including whether certain videos or themes might affect a patient's treatment.  If the team cannot make a decision based on its search of various resources, further review may be warranted.  If further review is needed, the patient will be advised that he may order the video for a physical review, but that he will have to assume any costs involved regardless whether the video is approved or denied.

If a video is approved, it will be added to the approved list.  The lists are updated frequently and made available to the patients so that they know which videos they are allowed to possess.  If a video is denied, a member of the video review team completes a video review rating form, specifying the reasons for the denial based on criteria in the policy.  The video is added to the denied list.  Patients may request that a video be added to the

approved list to the team once per quarter. Patients may also request to have a video that is on the denied list re-reviewed by the team. Such a request would count as the patient's one request per quarter.

When a video is denied for one patient, it is denied for all patients. Approved movies are shown on the Sand Ridge movie channel, where up to seven movies are played daily. The current approved video list contains more than 5,000 titles. The current denied video lists contains approximately 2,000 titles. In addition to the center's movie channel, patients have access to 49 TV channels and four music channels that are rotated monthly. Sand Ridge completes a patient survey every three years asking for input on available channels through the current provider. Television channels are reviewed by the treatment director to insure that the content is not counter-therapeutic to the progress of patient treatment. No channels were denied based on the last patient survey.

### C.  Denial of Plaintiff's Property Requests

Plaintiff has been denied various forms of media while being housed at Sand Ridge. He has been denied access to several movies because the movies had a Canadian rating but not a United States rating. Sand Ridge does not permit movies with only Canadian ratings for several reasons: the ratings are assigned by provincial and territorial review boards; the ratings may vary depending on the rating system used; and the ratings do not always reflect accurately the content of the movie or its appropriateness for certain ages.

Plaintiff has been denied other movies on the ground that they contain full frontal

nudity, depict children in sexualized ways, depict sex with minors, depict non-consensual sex and sexual assault, depict degrading or violent sex, depict elements that feed offense related sexual fantasies, depict violence as a normal way of life, sensationalize or support criminal activity or drug use, contain gratuitous violence or senseless killing.  Plaintiff has also been denied a topless calendar, an CD with a bondage image, a CD insert containing gang imagery and pictures containing genital nudity and sexualized minors.

OPINION

Plaintiff contends that the First Amendment grants him unrestricted access to all pictures, books and movies that the general public can access legally.  He contends that Sand Ridge's policies restricting access to certain media violate that First Amendment right.  However, plaintiff is mistaken.  A civil detainee "simply does not possess the full range of freedoms of an unincarcerated individual" because "[t]he fact of confinement as well as the legitimate goals and policies" of the institution limit constitutional rights.  Bell v. Wolfish, 441 U.S. 520, 545–46 (1979).  The Court of Appeals for the Seventh Circuit has upheld regulations prohibiting sexually explicit material in prisons and for civil detainees.  See, e.g., Payton v. Cannon, 806 F.3d 1109, 1110 (7th Cir. 2015);  Bailey v. Stover, 766 F. App'x 399, 402 (7th Cir. 2019).  See also Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2003) (persons confined as sexually violent "may be subjected to the ordinary conditions of confinement").

To determine whether Sand Ridge's personal property policy violates plaintiff's

constitutional rights, I must apply the four factors set forth in Turner v. Safley, 482 U.S. 78 (1987): (1) whether there is a valid, rational connection between the restriction and a legitimate government interest; (2) whether alternatives for exercising the right remain to the plaintiff; (3) what impact accommodation of the right would have on staff, other residents and institution resources; and (4) whether there are other ways that officials can achieve the same goals without encroaching on the right.  Id. at 89-91.  See also Brown v. Phillips, 801 F.3d 849, 853-54 (7th Cir. 2015) (applying Turner to Chapter 980 patients' First Amendment claims).  With respect to sexually violent persons who have been civilly committed, the court of appeals has explained that "the restraint must be rationally connected to the state's interests [of] security and rehabilitation and treatment of sexually violent persons."  Brown, 801 F.3d at 853.  The state cannot ban media content without "some evidence to show that the restriction is justified."  Id. (citations omitted).

Plaintiff argues that there is no valid, rational connection between Sand Ridge's legitimate interest in rehabilitating sex offenders and maintaining security at the center and the restriction on his right to view sexually stimulating material or possess other property deemed "counter-therapeutic."  His primary argument is that permitting patients to view all types of media will help train patients how to behave when they are released.  He argues that if patients have difficulty viewing such materials, they can seek help from treatment providers at Sand Ridge.

However, Dr. Smith gives the opinion that the restrictions on personal property are critical to maintaining a safe and therapeutic environment for Sand Ridge patients.  He

10

states that certain movies, music and TV shows can be too provocative and can trigger risk and trauma problems in patients, including sexual deviance and paraphilic behavior. Smith also says that patients at Sand Ridge have a higher likelihood of being negatively influenced by the content of certain movies, music and TV shows.

I must defer to Smith's expertise on disputed matters of professional judgment, such as whether material is counter-therapeutic and detrimental to a sex offender's treatment. Payton, 806 F.3d at 1110; Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002) ("Facilities dealing with those who have been involuntarily committed for sexual disorders are volatile environments whose day-to-day operations cannot be managed from on high."); Bailey, 766 F. App'x at 402. Plaintiff's own opinions cannot overcome the presumption that treatment staff's professional judgment is proper. Tanksley v. Litscher, 723 F. App'x 370, 372 (7th Cir. 2018) (inmate's own belief as to whether images will interfere with his rehabilitation not objective) (citing Borzych v. Frank, 439 F.3d 388, 391 (7th Cir. 2006) (inmate's opinion on security not objective)). Thus, the first Turner factor weighs in favor of finding Sand Ridge's property policies reasonable.

The second Turner factor also weighs in favor of upholding Sand Ridge's policies. Plaintiff does not dispute that he retains alternative means of exercising his freedom to read, view pictures, listen to music and watch movies. He can possess up to 25 publications and has access to 49 television channels. He has access to 5,000 movies. The evidence of these other avenues of expression is evidence of the policy's reasonableness.

As to the third factor, Dr. Smith's opinion shows that allowing unrestricted access to

all forms of media would have an adverse effect on operations at Sand Ridge. Allowing unfettered access to media would be counter-therapeutic because certain media reinforces deviant sexual distortions, triggers trauma and encourages paraphilic behavior.

Finally, the fourth factor weighs in favor of Sand Ridge. Plaintiff has not identified alternatives that would accommodate his access to banned materials at a de minimus cost to Sand Ridge's legitimate interest in rehabilitation and therapy. The only alternative he proposes is open access to all media. For the reasons discussed above, defendant has submitted evidence showing that open access is not a viable option at Sand Ridge.

## ORDER

IT IS ORDERED that

1. Plaintiff Scott Maher's motion opposing defendants' expert witness disclosure, dkt. #36, is DENIED.

2. Plaintiff's motion for assistance in recruiting counsel, dkt. #43, is DENIED.

3. Defendant Doug Bellile's motion for summary judgment, dkt. #25, is GRANTED.

4. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 9th day of November, 2020.

BY THE COURT:
/s/

_____
BARBARA B. CRABB
District Judge